**UNITED STATES of America,
Plaintiff,**

v.

**Paul Bradley VANLEER, Defendant.**

**No. 2:03–CR–00137 PGC.**

United States District Court,
D. Utah,
Central Division.

July 3, 2003.

As Amended July 17, 2003.

Eric D. Petersen, Salt Lake City, UT, for Plaintiff.

Henri R. Sisneros, Salt Lake City, UT, for Defendant.

## OPINION AND ORDER GRANTING MOTION FOR DOWNWARD DEPARTURE

CASSELL, District Judge.

This criminal case is before the court on defendant Paul Bradley VanLeer's motion for a downward departure. VanLeer has pled guilty to possession of a firearm by a convicted felon. He agrees with the government that the applicable sentencing guidelines produce a sentencing range of 30 to 37 months. VanLeer argues, however, that the court should depart downward from this range under U.S.S.G. 5K2.11, which allows a departure where the crime did not "threaten the harm or evil" ordinarily covered by the statute at issue. VanLeer observes that his crime involved merely taking a firearm to a pawn shop to sell it.

The court agrees with VanLeer that a downward departure is appropriate on this basis. In reaching that conclusion; however, the court has found it necessary to review the effects of a newly passed federal statute involving downward departures—the so-called "Feeney Amendment." In some quarters, the view has been expressed that the Feeney Amendment "essentially eliminates judges' discretion to depart below the Guidelines in all cases."[1] This opinion explains the court's conclusion that the Feeney Amendment does not have such far-reaching effects and why a downward departure is appropriate here.

## FACTUAL BACKGROUND

This case involves a somewhat unusual fact pattern that resulted in a felon-in-possession charge when a felon was dispossessing himself of a firearm. The court finds the facts to be as follows. VanLeer has a history of non-violent criminal offenses, all apparently stemming from his use of illegal drugs. On September 10, 2002, VanLeer was released from prison after serving time connected with a forgery charge. Several weeks after his release, he met a friend who was in possession of a shotgun that VanLeer had purchased and owned before acquiring a felony conviction. As VanLeer was destitute and needed money for rent, he took the firearm—a Ted Williams 12 gauge shotgun—to a local pawn shop and sold it. During this transaction on October 1, 2002, VanLeer gave his correct name, address, and an inked fingerprint to verify his identity as owner of the firearm to the pawn shop clerk.

On November 5, 2002, an investigator from the Salt Lake City Police Department conducted a record check and determined that VanLeer was a previously convicted felon. This led to the filing of a one-count indictment, charging felon in possession of a firearm in violation of 18 U.S.C. 922(g)(1). The defendant pled guilty, leading to this sentencing.

Both sides agree that the proper offense level starts at a level 14 under the guidelines applicable to felons in possession of a firearm.[2] Both sides further agree that a two-level reduction for accepting responsibility is appropriate, producing a final offense level of 12. VanLeer's criminal history (involving driving under the influence of alcohol, forgery, reckless driving, theft, attempted forgery, shoplifting) is a level

---

1. Mark H. Allenbaugh, *Who's Afraid of the Federal Judiciary? Why Congress' Fear of Judicial Sentencing Discretion may Undermine a* *Generation of Reform,* 27 Jun Champion 6, 9 (2003).

2. *See* U.S.S.G. 2K2.1(a)(6).

VI, establishing a sentencing range of 30–37 months. VanLeer seeks a downward departure from this range.

## DISCUSSION

### I. Standards for a Downward Departure Before the Feeney Amendment

The Supreme Court and the Tenth Circuit have announced the general standards for a downward departure under the sentencing guidelines. In 1996, the Supreme Court explained that when a sentencing court is considering departing from the Guidelines, it should ask four questions:

1) What features of this case, potentially, take it outside the Guidelines' "heartland" and make it a special, or unusual case?

2) Has the Commission forbidden departures based on those features?

3) If not, has the Commission encouraged departures based on those features?

4) If not, has the Commission discouraged departures based on those features? [3]

If a factor is not mentioned in the Guidelines, as in this case, then "the court must, after considering the 'structure and theory of both relevant individual guidelines and the Guidelines taken as a whole,' decide whether it is sufficient to take the case out of the Guideline's heartland." [4] The Tenth Circuit has instructed that a sentencing court, when considering a downward departure on grounds that the case is "outside the heartland" must determine whether the departure is consistent with the Guidelines' goals. [5] These goals are to "(1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the crime; (2) deter criminal conduct; (3) protect the public from the defendant's further crimes; and (4) provide the defendant with needed correctional care or treatment." [6]

Departures—both downward and upward—are a critical component of the sentencing guideline scheme. Departures provide flexibility to what would otherwise be an unduly rigid system. Indeed, without departures to avoid unduly lenient or unduly excessive punishment, it seems likely that popular support for sentencing guidelines would quickly erode. Presumably for this very reason Congress directed that the sentencing guidelines should be crafted (and presumably interpreted) so as to "avoid[ ] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices…." [7]

These pronouncements on downward departures, however, all predate the passage of the Feeney Amendment, adopted by Congress on April 10, 2003 with an effective date of April 30, 2003. Both Sides have apparently agreed that the Feeney Amendment governs the sentencing at issue here. There is a substantial question concerning the constitutionality of retroactively applying the Feeney Amendment to VanLeer, who committed his crime before

---

**3.** *Koon v. United States,* 518 U.S. 81, 95, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); citing *United States v. Rivera,* 994 F.2d 942, 949 (1st Cir.1993).

**4.** *Koon,* 518 U.S. at 95, 116 S.Ct. 2035 (*citing Rivera,* 994 F.2d at 949).

**5.** *See United States v. Miranda–Ramirez,* 309 F.3d 1255, 1260 (10th Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 1380, 155 L.Ed.2d 217 (2003).

**6.** *Id.* (*citing* 18 U.S.C. § 3553(a)(2)).

**7.** 28 U.S.C. § 991(b)(1)(B).

effective date of the Act. In view of the parties' agreement, however, the court will assume the Amendment applies retroactively. The question thus arises: what effect does the Feeney Amendment have on these general standards for downward departures?

## II. The Effect of the Feeney Amendment on Downward Departures

### A. Legislative History of the Feeney Amendment.

On February 24, 2003, the Senate considered and unanimously passed what was formally called the Prosecutorial Remedies and Tools Against the Exploitation of Children Today ("PROTECT") Act of 2003.[8] This legislation focused on enhancing the prosecution of child pornography. When the House took up the measure on March 26, 2003, its focus was on legislation to prevent child abduction, including a national notification system to find abducted children known as the Amber Alert.[9] On March 27, 2003, Representative Tom Feeney proposed amending this legislation to "address[ ] long-standing and increasing problems of downward departures from the Federal sentencing guidelines."[10] His amendment would have restricted downward departures in all cases. Departures would be limited to grounds that had been "affirmatively and specifically identified as a permissible ground of downward departure in the sentencing guidelines or policy

statements."[11] The justification for this restriction was to prevent judges from "mak[ing] up exceptions [to the guidelines] as they go along."[12] The Feeney Amendment was approved by a vote of 357 to 58,[13] and the child abduction prevention legislation to which it was attached passed overwhelmingly as well.[14]

After the House's approval of legislation differing from the Senate's, the matter went to a Conference Committee. While pending there, a variety of diverse commentators expressed their concern about various aspects of the Feeney Amendment. For example, the Judicial Conference of the United States, through the Chief Justice, expressed its view that "this legislation, if enacted, would do serious harm to the basic structure of the sentencing guideline system and would seriously impair the ability of courts to impose just and responsible sentences."[15] Similarly, Business Civil Liberties, Inc., offered its view that the Amendment would interfere with the proper sentencing of those in the business community who had committed criminal offenses involving essentially regulatory infractions.[16] The National Association of Criminal Defense Lawyers argued that "[w]ithout the discretionary authority to depart, all crimes regardless of the circumstances would have to be sentenced exactly the same; one size must fit all...."[17]

Apparently as a result of concerns such as these, the Conference Committee

---

8.  See 149 CONG. REC. S2573–90 (daily ed. Feb. 24, 2003).

9.  See 149 CONG. REC. H2320–H2325 (daily ed. Mar. 26, 2003).

10.  149 Cong. Rec. H2422 (daily ed. Mar. 27, 2003) (statement of Rep. Feeney).

11.  Id. at H2420.

12.  Id. at H2435 (statement of Rep. Feeney).

13.  See Id. at H2436.

14.  See Id. at H2438.

15.  Letter from the Chief Justice to Sen. Patrick Leahy (Apr. 2, 2003).

16.  See Business Civil Liberties, Inc., Business Civil Liberties, Inc. Opposed Limiting Downward Departures in Federal Sentencing (Apr. 7, 2003).

17.  Letter from NACDL to congressional representatives (Apr. 9, 2003).

reached a bipartisan compromise, which substantially narrowed the breadth of the Feeney Amendment.[18] The compromise version has been called the Hatch–Sensenbrenner–Graham compromise amendment,[19] but for clarity here will be identified as the "Feeney Amendment." This Amendment made the most restrictive limitations on downward departures applicable only to certain child crimes and sex offenses.[20] With this change, the House and the Senate agreed to the conference report on April 10, 2003, the President approved it, and the Act became effective on April 30.2003.[21]

### B. Changes in the Standards for Departures.

As finally approved by Congress, the Feeney Amendment makes a variety of changes related to sentencing procedures. The Amendment expands appellate review of sentencing departures [22] and alters the procedures to be used following remands in such cases.[23] The Amendment further requires a formal government motion before awarding a defendant a three-level reduction for accepting responsibility (instead of the normal two-level reduction).[24] In an effort to gain additional data about the sentencing guidelines, the Amendment directs the Chief Judge of each district to submit information about sentencing judgments to the Sentencing Commission, which in turn makes it available to Congress if so requested. The Amendment also directs the Sentencing Commission to promulgate, within 180 days after enactment of the Amendment, new guidelines that "ensure that the incidence of downward departures are substantially reduced" [25] and a new policy statement "authorizing a downward departure of not more than 4 levels if the Government files a motion or such departure pursuant to an early disposition program authorized by the Attorney General and the United States Attorney." [26] Finally, the Amendment directs the Attorney General to take certain steps toward aggressively appealing improper downward departures.[27]

None of these reforms restrict the ability of a district court to depart downward (or upward). The Feeney Amendment does, however, make one *limited* change in the ability of district courts to depart downward in child abduction and sex offense cases—a limited change that has been described in dramatically different terms. For example, a prominent journal circulated to defense attorneys seemingly suggested that the Feeney Amendment

---

**18.** *See* H.R. CONF. REP. No. 108–66, Title IV (2003).

**19.** *See, e.g.,* 149 CONG REC. S5137–01 (daily ed. Apr. 10, 2003) (statement of Sen. Hatch).

**20.** *See* PROTECT Act, Pub.L. No. 108–21 § 401, 117 Stat. 650, 667 (to be codified as 18 U.S.C. § 3553(b)).

**21.** *See* 149 CONG REC. H3075–76 (daily ed. Apr. 10, 2003); *id.* at S5156 (daily ed. Apr. 10, 2003). *See generally* PROTECT Act, Pub.L. No. 108–21, 117 Stat. 650 (to be codified as 18 U.S.C. § 3553), Legislative History.

**22.** *See* PROTECT Act, Pub.L. No. 108–21, § 401(d), 117 Stat. 650, 670 (to be codified as 18 U.S.C. § 3742(e)(3)).

**23.** *See id.*

**24.** *See* PROTECT Act, Pub.L. No. 108–21, § 401(g), 117 Stat. 650, 671 (to be codified as 28 U.S.C. § 994(a)).

**25.** PROTECT Act, Pub.L. No. 108–21, § 401(m), 117 Stat. 650, 675 (to be codified as 28 U.S.C. § 994).

**26.** PROTECT Act, Pub.L. No. 108–21, § 401(m)(2)(B), 117 Stat. 650, 675 (to be codified as 28 U.S.C. § 994).

**27.** *See* PROTECT Act, Pub.L. No. 108–21, § 401(*l* )(2)(A) & § 401(1)(3), 117 Stat. 650, 674 (to be codified at 18 U.S.C. 3553 note).

"essentially eliminates judges' discretion to depart below the Guidelines in *all* cases." [28] This description is not accurate, as the brief review of legislative history just recited makes clear. The Feeney Amendment ultimately adopted by Congress is substantially narrower than originally proposed. For child abduction and sex offenses, the Amendment does limit downward departures to the grounds specifically listed in the sentencing guidelines for these offenses.[29] But for all other offenses—such as the felon-in-possession offense at issue here—the Feeney Amendment makes no change. As Senator Hatch, the Chairman of the Judiciary Committee and member of the Conference Committee on the Act explained: "The compromise agreed to in conference will affect only crimes against child and sex crimes—that is, sexual abuse, pornography, prostitution, and kidnaping/hostage taking. These types of cases represent only 2 percent of the federal criminal case load." [30]

The court has gone to the lengths of writing an opinion on this point because hyperbolic claims about how departure authority has been "eliminated" in "all cases"

can be positively harmful to individuals awaiting sentencing. If criminal defense attorneys believe such statements and operate under the misapprehension that downward departures are no longer permissible, they might refrain from filing departure motions in appropriate cases. This could lead to criminal defendants serving unduly long prison terms (not to mention inappropriately consuming valuable federal prison space that should be reserved for other offenders). It is therefore critically important that defense counsel understand the narrow parameters of the Feeney Amendment and continue to file motions for downward departure where appropriate. Of course, the government should continue to file upward and downward departures where appropriate as well.

When departure motions are filed, this court will review them in the same way that it always has—it will be grant them where proper and deny them where improper. The reason for emphasizing this obvious point is that suggestions have been made that federal judges might somehow be "intimidated" by the Feeney Amendment's reporting requirements.[31] For ex-

---

**28.** Mark H. Allenbaugh, *Who's Afraid of the Federal Judiciary? Why Congress' Fear of Judicial Sentencing Discretion may Undermine a Generation of Reform,* 27 CHAMPION 6, 9 (2003) (emphasis added).

**29.** *See* PROTECT Act, Pub.L. No. 108–21, § 401, 117 Stat. 650, 667 (to be codified as 18 U.S.C. § 3553(b)).

**30.** 149 CONG. REC. S5113–01 (daily ed. April 10, 2003) (statement of Sen. Hatch).
Even with respect to the narrow category of cases involving child abduction and sex offenses, the claim that the Feeney Amendment "eliminates" a judge's ability to depart downward appears to be significantly overstated. The Feeney Amendment appears to restrict a judge's ability to depart downward to grounds for departure specifically identified in the Sentencing Guidelines. *See* PROTECT Act, Pub.L. No. 108–21 § 401, 117 Stat. 650, 667

(to be codified as 18 U.S.C. § 3553(b)(2)(A)). As Senator Hatch explained, "Contrary to the oft repeated claims of the opponents, the compromise proposal is not a mandatory minimum. Judges hands handling these important criminal cases can sometimes exercise discretion to depart downward, but only when the Sentencing Commission specifies the factors that warrant a downward departure, only when they have the right to do so as listed by the Sentencing Commission." 49 CONG. REC. S5113–01 (daily ed. April 10, 2003) (statements of Sen. Hatch). Given that the Guidelines identify a number of grounds for downward departure—presumably including the most frequently-encountered grounds for departure—the Amendment appears to restrict departures in only a minority of cases.

**31.** 149 CONG. REC. H3059–02 (daily ed. April 10, 2003) (statement of Ms. Jackson–Lee).

ample, during the Senate debate on the final version of the bill, the ranking member of the Judiciary Committee argued:

> The amendment effectively creates a judicial "black list" of judges that stray from the draconian mandates of this bill. The [final] language retains the Feeney amendment's attempt to intimidate Federal judges by compiling a "hit list" of all judges who impose sentences that the Justice Department does not like in any type of criminal case. It takes a sledge hammer to the concept of separation of powers.[32]

The basis for contention about a "black list" appears to be the provision in the Feeney Amendment requiring the Attorney General to submit a report to the House and Senate Judiciary within 15 days whenever a district court judge departs downward in a case (other than for reasons of substantial assistance to the government).[33] This report would identify the judge who departs by name. It is unclear whether this provision will ever take effect, however, because its effective date has been suspended for 90 days and, if the Attorney General take steps to ensure "vigorous pursuit of appropriate and meritorious appeals" of unjustified downward departures it appears that the provision is suspended indefinitely.[34] Even were such a provision to take effect, however, the overriding fact remains that judicial departure decisions (like any other judicial action) are *already* matters of public record. This court's sentencing decisions, for example, are all easily available both in the court's public files and on an internet website, *www.utd.uscourts.gov.* In any event, since the suggestion has been raised, this court wishes to observe that it is not concerned about close scrutiny of its downward (or upward) departure decisions by Congress, the public, or otherwise.

### C. Procedural Changes in the Feeney Amendment.

While the Feeney Amendment does not substantively change the ability of district courts to depart in most cases, it does make a *procedural* change that deserves brief discussion. The Amendment requires all departures—both downward and upward—to be described with specificity in writing in the judgment. After the Amendment, the relevant statutory language now reads:

> The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence— . . .
>
> is outside the range[ ] described in [in the sentencing guidelines], the specific reason for the imposition of a sentence different from that described, *which reasons* [sic] *must also be stated with specificity in the written order of judgment and commitment* . . . . [35]

Therefore, in contrast to previous practice under which a district judge could orally state the reasons for a departure at the time of sentencing, the new legislation requires that such reasons be stated "with specificity" in writing. This provision's rationale appears to be facilitating appellate review of district court departure decisions, as such review is expanded by the Feeney Amendment.

This new practice requires the court, prosecutors, and defense counsel, to think

---

**32.** 149 Cong. Rec. S5137–01 (daily ed. April 10, 2003) (statement of Sen. Leahy).

**33.** *See* PROTECT Act, Pub.L. No. 108–21, § 401(*l*)(2)(B), 117 Stat. 650, 676 (to be codified as 18 U.S.C. 3553 note).

**34.** *See* PROTECT Act, Pub.L. No. 108–21, § 401(*l*)(2)(A) & § 401(1)(3), 117 Stat. 650, 674 (to be codified as 18 U.S.C. 3553 note).

**35.** PROTECT Act, Pub.L. No. 108–21 § 401(c), 117 Stat. 650, 669 (to be codified as 18 U.S.C. § 3553(c)).

about how departure findings can best be reduced to writing expeditiously. Delay in finalizing criminal judgments should be avoided because defendants are unable to receive a designation from the Bureau of Prisons until the judgment is completed and signed by the judge. Defendants are better off if they move quickly to facilities designed for long term confinement and equipped to provide vocational and other training. In addition, the public has a strong interest in rapid completion of criminal judgments. Any delay at this stage creates significant additional expense to the taxpayers, as the use of temporary facilities for housing prisoners often substantially exceeds that of the Bureau of Prison facilities. Moreover, in many jurisdictions (including Utah) temporary jail space for federal prisoners is difficult to locate.

How to reduce reasons for departures to writing quickly deserves general consideration. Perhaps this court's standard judgment and conviction form should be modified to provide space for entry of such findings. Alternatively, it might be useful if the writing could occur during the sentencing proceeding itself, perhaps with the assistance of the parties. Prosecutors will most frequently be involved in departure motions, as the vast bulk of downward departure motions are made by the government seeking recognition of a defendant's "substantial assistance" to government authorities. The government less frequently files upward departure motions, but when these motions are filed they typically involve extraordinarily serious cases. It may be that the government, when filing departure motions—either upward or downward—should also include a proposed written order that could be attached to the judgment stating with specificity the reasons for departure.[36] Likewise, defense counsel may wish to do the same when filing their motions for a downward departure. No doubt, there are other approaches that could be pursued. In this case, the court will attach this opinion to the judgment as its statement of reasons for the departure. The court, however, invites counsel in criminal cases to consider ways in which the writing requirement can be expeditiously handled.

One last issue deserves brief mention. The Feeney Amendment, as part of the PROTECT Act, became effective on April 30, 2003.[37] Because the Feeney Amendment does not operate to retroactively dis-

---

**36.** Government prosecutors may also wish to consider how to smoothly implement another part of the Feeney, which allows a reduction in the offense level of three levels (rather than the standard two levels) upon a prosecutor's "formal motion at the time of sentencing." PROTECT Act, Pub.L. No. 108–21, § 401(g), 117 Stat. 650, 671 (to be codified as 28 U.S.C. § 994(a)). The administrative problem that this provision might create is modifying every presentence report in all cases in which the three-level reduction is granted. At the time the probation office prepares the pre-sentence report, the formal motion for the third-level reduction will not have been made. As a result, the office might prepare a report reflecting only a guidelines calculation based on a two-level reduction, which would then need to be formally amended at the time of sentencing to reflect a three-level reduction.

This could lead to a proliferation of "amendments" to pre-sentence reports, which is burdensome to the courts and confusing to the those (such as the Bureau of Prisons) who have to rely on their calculations. To avoid this problem, the government might consider placing a provision in its plea agreement to the effect that it anticipates making a motion. That would permit the probation office to prepare the pre-sentence report on the assumption that the three-level motion would be forthcoming. This approach would limit the need for an amendment of the pre-sentence report to the relatively rare case where such a motion was not forthcoming.

**37.** *See* PROTECT Act, Pub.L. No. 108–21 § 401, 117 Stat. 650, 667 (to be codified as 18 U.S.C. § 3553(b)).

advantage VanLeer, there is no ex post facto problem here.[38]

To summarize, the Feeney Amendment does not change the pre-existing law which allowed a downward (or upward) departure where the court determines that, given the "structure and theory of both relevant individual guidelines and the Guidelines taken as a whole," [39] the case at hand is outside the Guidelines' heartland.[40]

### III. Departures for Felons Dispossessing Themselves of Firearms

■ VanLeer argues that because he was *dispossessing* himself of the firearm covered in the indictment that his behavior lies "outside the heartland" of the charged offense. This argument gains support from one specifically-listed ground for departure: where the defendant's "conduct may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue." [41] The Tenth Circuit has instructed that this harm-not-threatened departure "should be interpreted narrowly." [42]

VanLeer pled guilty to violating 18 U.S.C. § 922(g), which forbids felons (among other dangerous persons) from possessing firearms. The harm the law seeks to prevent is violent crimes and consequent personal injury and even death.[43] Thus, a downward departure would be appropriate where the defendant's conduct does not threaten these outcomes.

In this case, VanLeer's brief possession of a firearm does not threaten the harms

at which § 922(g) was directed. The facts plainly reveal that VanLeer briefly possessed the gun only because he intended to dispose of the gun. Indeed, it is undisputed that he did in fact dispossess himself of the firearm at a pawn shop. In that process, he used his own name and gave his own fingerprint. Nothing in the circumstances surrounding that transaction suggest any criminal intent. Rather, VanLeer was simply trying to take his property and pawn it to obtain money.

To be sure, as a convicted felon, VanLeer should have left the firearm where it was or, arguably, had his friend pawn it for him. But the question before this court at this stage is not whether VanLeer's conduct was lawful (it plainly was not) but rather whether it was outside the "heartland" of offenses covered by the applicable guideline. When a felon acts illegally to get rid of a firearm, that criminal offense is simply less culpable than when a felon continually possesses a firearm. Viewed another way, a gun that leaves the hands of a felon is less dangerous than a gun remaining in the hands of felon.

The Eight Circuit has reached a similar conclusion on somewhat similar facts. In *United States v. Lewis,*[44] the Eight Circuit reviewed a situation where the defendant, a felon, took a shotgun and pawned it for $50 to pay utility bills. The shotgun was a family heirloom, and the defendant returned a few days later to retrieve it. To retrieve the gun, the defendant completed an ATF Form 4473 in which he falsely

---

**38.** *See United States v. Sullivan,* 255 F.3d 1256, 1260 (10th Cir.2001), *cert. denied,* 534 U.S. 1166, 122 S.Ct. 1182, 152 L.Ed.2d 124 (2002).

**39.** *Rivera,* 994 F.2d at 949 (internal quotation omitted).

**40.** *See Koon,* 518 U.S. at 95, 116 S.Ct. 2035.

**41.** U.S.S.G. § 5K2.11.

**42.** *United States v. Warner,* 43 F.3d 1335, 1338 (10th Cir.1994).

**43.** *See United States v. Lewis,* 249 F.3d 793, 796 (8th Cir.2001); *Huddleston v. United States,* 415 U.S. 814, 824–25, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974).

**44.** 249 F.3d 793 (8th Cir.2001).

denied being a felon. In reversing a district court's decision not to depart downward, the Eighth Circuit held that "the sentencing commission must have envisioned departures under § 5K2.11 when an illegal weapon is not possessed for an unlawful purpose." [45] The Circuit remanded for further consideration, explaining that "the district court certainly could conclude that briefly possessing a firearm in order to pawn it to pay bills and attempting to keep a family heirloom in the family were not the types of harms or evils envisioned by Congress when it enacted § ... 922(g)(1)." [46]

In reaching this conclusion, the court is mindful of the Tenth Circuit's mandate that the harms-not-threatened departure guideline "should be interpreted narrowly." [47] Likewise, the court is fully aware of the substantial possibility that convicted felons may well lie about the circumstances surrounding their unlawful possession of a firearm—lies that the government may have a difficult time disproving. This court has frequently heard dubious claims from felons that they intended to get rid of a gun or had a gun only briefly. This case, however, stands on quite different footing from more routine situations. Here, the indisputable facts establish: (1) the defendant's possession of the firearm was quite brief (he had only been released from prison a few weeks earlier); (2) the possession was motivated solely by an interest in disposing of the property (he took it directly to a pawn shop); (3) the defendant made no secret of his possession (he used his own name and placed his own fingerprint on the federally required form); and most importantly, (4) the defendant in fact disposed of the gun in what would have otherwise been an entirely lawful transaction (sales of firearms to pawnshops are legal). In light of all these unusual factors, this case falls well outside the heartland of the usual felon-in-possession case and does not involve the kind of harms envisioned by Congress when it enacted the prohibitions against felons possessing firearms. The court will, therefore, depart downward.

■ The remaining question is the extent of the departure. The court believes that a four-level departure, from a level 12 to a level 8, is appropriate. This modest departure serves to differentiate Van-Leer's conduct from more culpable conduct of other felons. A four-level departure is roughly proportionate to the six-level downward departure that the guidelines authorize in other circumstances for unlawful possession of a firearm for lawful sporting purposes [48] and to the four-level upward departure that the guidelines authorize for possession of a firearm in connection with another felony offense.[49]

## CONCLUSION

For the foregoing reasons, the court grants the defendant's motion for a downward departure. The court departs downward from a level 12 to a level 8 and sentences the defendant to a term in prison of 18 months.

---

**45.** *Id.* at 795 (*citing United States v. White Buffalo,* 10 F.3d 575, 576 (8th Cir.1993)).

**46.** *Id.* at 796.

**47.** *Warner,* 43 F.3d at 1338 (10th Cir.1994).

**48.** *See* U.S.S.G. § 2K2.1(b).

**49.** *See* U.S.S.G. § 2K2.1(b)(5).